UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:06CR 99 ERW |
| ) | |
| CLIFTON BROWN, ) | |
| ) | |
| Defendant(s). ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The defendant is charged by Indictment with five counts: Count I - Possession With Intent to Distribute Marijuana; Count II - Possession With Intent to Distribute 5 Grams or More of Cocaine Base; Count III - Possession With Intent to Distribute Cocaine; Count IV - Possession With Intent to Distribute Marijuana; and Count V - Possession of Firearm in Furtherance of Drug Trafficking Crime.  The defendant has filed Defendant's Motion to Suppress Evidence and Statements (Document #41).  The government has filed Government's Response to Defendant's Motion to Suppress Evidence and Statements (Document #43).  An evidentiary hearing followed.

**Factual Background**

On April 17, 2006, DEA Special Agent Bernard Gard was driving his automobile on Bloomfield Road in Cape Girardeau, Missouri.  At around 2:05 P.M., Gard saw a blue, two-door Cadillac with dark tinted windows and custom wheel covers enter the U Store & Lock It storage business located at 2301 Bloomfield Road.  The Cadillac had a temporary license tag on it of 305G848.

The storage facility has a fence around it with a gated entrance for vehicles. The business office is nearby the entrance. Before a vehicle can enter the storage facility, the driver must punch in a pre-approved code number so the gate will open, allowing access to the car. That code number is approved by the storage business. The storage units all have doors with hasps that can be fitted with a lock. Individuals can rent these storage units for a monthly fee.

On April 17, 2006, the Cadillac driver pulled up to the gate and entered a code. The gate opened and the Cadillac entered the facility. Gard drove his car into the facility while the gate was still open. The gate shut behind Gard's vehicle. Gard drove around the storage buildings.

Gard saw the Cadillac parked at the far end of the storage buildings in front of Storage Unit 349 with its passenger door open. Unit 349 was also open. Gard could see another vehicle in the unit with its lights on.

Gard went to the gate and waited for someone to punch in a code so he could leave. Shortly after that, the Cadillac appeared at the gate. The driver punched in a code and drove out of the area. Gard then drove through the gate. When Gard got through the gate, he noticed that the Cadillac had stopped. The driver of the Cadillac, a black male, got out of the car and approached Gard's car. The person asked Gard why Gard did not have a security code for the gate. The person also demanded that Gard get out of his car and wait for the police. Instead, Gard drove off.

Gard waited until the Cadillac had left the area and contacted Alberta Gwin at the storage facility business office. She told Gard that the renter of Unit 349 was Clifton Brown. She provided Gard with a copy of Brown's driver's license. Gard noticed that the person shown on Brown's driver's license photo was the same person that contacted him earlier at the gate. Gwin stated that Brown rented the unit for $140 per month and always paid on time and in cash. Brown had rented a unit since January. Another business employee obtained a record showing the times that Brown

had entered the storage facility during the past 45 days. The record showed that a person using Brown's security code had entered the facility 76 times in those 45 days, mostly between 4:00 P.M. and 4:00 A.M.

Gard asked that a dog capable of detecting controlled substances be brought to the storage facility. Cape Girardeau Police Officer Bourbon brought his drug dog to the area. Bourbon brought the dog around the front of the storage units. At Unit 349, the dog gave a positive indication of controlled substances in Unit 349 by scratching and barking aggressively at the door to that unit. Cape Girardeau Police Officer Rahn appeared with his drug dog. That dog also indicated the presence of controlled substances at the door to Unit 349.

Cape Girardeau Detective Dan Seger was apprised of the situation. He made application for a state search warrant for Unit 349 to a local judge in Cape Girardeau County. Seger signed an affidavit attached to that application. That application was approved at around 5:00 P.M. on April 17, 2006, the same day as Gard's contact with Brown. The officers immediately went to the storage facility and began their search.

The officers had to cut the lock off the door to Unit 349. They went in and found the following:

> a Norinko, SKS assault rifle, bearing serial number 94144383; and
> a Ruger, Model 10-22 rifle, bearing serial number 12688112; and
> a Marlin, .22 caliber, Model 60 rifle, bearing serial number 6414828; and
> a Mossberg, Model 835, 12 gauge shotgun, bearing serial number UM182112; and
> numerous rounds of ammunition, including rounds of .38 caliber, .45 caliber, 7.62
>     caliber and 12 gauge shotgun shells; and
> a red backpack containing:
>     four packages of marijuana weighing 2313 grams (approximately 5 pounds);
>       and
>     two empty vacuum type bags;
> a blue tote box containing:
>     a digital scale with cocaine residue; and
>     an empty box for a Triton T-2 digital scale; and
>     a box containing .38 Special ammunition; and

- 3 -

>       a small quantity of marijuana; and
>       numerous sandwich baggies
> a 1998 Chevrolet Tahoe, bearing license plate number 721-2589.

All of the above listed items were seized.

The officers made contact with the storage lot employees and told them that they were interested in talking to Brown if he appeared at the storage facility again. The officers asked the employees to call them if Brown came back to the unit. The officers had some leads on Brown's location in Illinois and tried to locate him that night. However, they were unsuccessful in making contact with Brown on April 17, 2006.

On April 18, 2006, one of the employees from the storage facility called the officers and reported that Brown had just entered the lot, driving the Cadillac. They reported that another car was following Brown. The officers responded to the storage business. The storage lot employee then disabled Brown's code number from the security system, thereby preventing him from leaving the facility. The employee did this action on her own account, without instructions from the officers.

Brown drove to Unit 349 along with the other car, a Buick. Shortly thereafter, Brown drove to the gate, followed by the Buick. He punched in his access code, but the system would not open the gate. Brown went inside the business office. While he was in that office, the police officers arrived. Brown left the office by another door and ran from the area. Some of the officers chased after him.

Other officers, including Mike Alford and Seger, then walked up to the two cars. Crystal Warren was the driver of the Buick. Seger asked Warren for permission to search her car. Warren declined to give that permission. Seger told her that they were calling for a drug dog to come to that location to see if they could detect any controlled substances coming from either of the cars. Seger said that she was free to leave. Warren then walked away from the area.

Officer Bourbon arrived with his drug dog. The dog alerted on the engine compartment of the Buick as being an area with a controlled substance. The hood of the Buick was opened. Under the hood, the officers found a Triton T-2 digital scale along with two baggies of a suspected controlled substance. One baggie was later confirmed as containing 28. grams of cocaine base. The other baggie contained 22.8 grams of powder cocaine.

One of the officers had a phone number for Warren. He called Warren, told her of the discovery of the narcotics under the hood of the car she was driving, and then asked if she would come to the police station so they could talk with her. Warren agreed. A short time later, Warren appeared at the police station with some members of her family. She was interviewed by Gard, who first gave her a <u>Miranda</u> warning. Warren agreed to make a statement.

Warren told Gard that she and Brown were a couple and that they had a child together. She said they went to the storage unit that day so that Brown could park his Cadillac in the unit. Warren was going to give him a ride in the car she was driving. Warren said that she saw Brown put the packages under the hood of the Buick and that she knew the materials were cocaine.

Brown was later found to be hiding in an apartment at 639 South Spring Street. The renter of that apartment granted the officers permission to search it after Brown came out. The officers went inside and found and seized the following items:

- a Smith & Wesson, .38 caliber revolver, bearing serial number 602265, loaded with five rounds of ammunition, found under a mattress; and
- a Hi-Point, .380 caliber pistol, bearing serial number P712157, loaded with nine rounds of ammunition, found under a bed; and
- an open box of .38 caliber ammunition, containing five rounds, found under a mattress; and
- 2 small plastic baggies of marijuana, found under a mattress.

The renter of the apartment said that the above items were not hers. Brown was interviewed by Gard, after being given a <u>Miranda</u> warning by Gard. Brown admitted that he put the two firearms,

the ammunition and the marijuana under the bed and mattress. He admitted that he put the cocaine base and the cocaine powder in the Buick in the engine compartment. Brown stated that he had found the drugs in a backpack along a road and was going to give them to his friends.

A later check of the weapons disclosed that the Ruger, .22 caliber rifle was purchased by Crystal Warren from the Cape Girardeau Wal-Mart.

The officers also discovered that the Buick was registered in the name of Deborah Clark, of 21589 Rail Road Avenue, P. O. Box 71, Unity, Illinois 62993.

## Discussion

### Defendant's Motion to Suppress

In Defendant's Motion to Suppress Evidence and Statements, the defendant sets out the following grounds in support of his motion:

1. There was no probable cause to request the issuance of a search warrant for the U Store and Lock It storage facility, Unit #349, located at 2351 Bloomfield Road, Cape Girardeau, Missouri.

2. The request for drug-sniffing dogs was unwarranted and unconstitutional.

3. The search of 639 South Spring, Apartment E, in Cape Girardeau, Missouri, on April 18, 2006, was made without valid consent.

4. The search of a maroon Buick automobile on April 18, 2006, was made without valid consent and without a valid warrant.

5. Any oral or written statements made by the defendant were involuntary, elicited by coercion and without the defendant's being fully advised of and afforded his rights under the Fifth Amendment.

6. Any oral or written statements made by the defendant followed an unlawful arrest and are, therefore, inadmissible.

## **Probable Cause**

Probable cause to search has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Supreme Court rejected the prior tests required by Spinelli v. United States, 393 U.S. 410, 898 S.Ct. 584 (1969), finding that "the complex superstructure of evidentiary and analytical rules that some have seen implicit" in the Spinelli decision cannot be reconciled with the fact that many warrants quite properly are "issued on the basis of non-technical, commonsense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id. at 235, 2331. The Court offered the following caution to reviewing courts, Id. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

      a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes for many different types of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court continued, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v. United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

The Affidavit of Detective Dan Seger of the Cape Girardeau, Missouri, Police Department submitted in support of Detective Seger's Application for the Search Warrant began with DEA Agent Bernie Gard's observation of what Agent Gard considered a "suspicious vehicle" entering the business premises of "U Store and Lock It." The vehicle was traveling at "an unusually slow rate of speed." The affidavit recites Agent Gard's entrance into the storage facility and his exiting, followed by the driver's asking Agent Gard what his reason was for being behind the storage unit fence. The individual later identified as the defendant, Clifton Brown, demanded that Gard exit his vehicle so police could be contacted. Gard left the premises.

Seger's affidavit continued that the manager at U Store and Lock It was interviewed by Agent Gard and the manager identified the renter of Storage Unit #349 as Clifton Brown, who lived at 646 Spring, Apartment H, in Cape Girardeau, Missouri. Brown rented the largest unit available at the business, measuring 10 feet by 40 feet. Brown pays cash each month. The manager told Gard that from March 1, 2006, to April 17, 2006, Brown entered the facility 76 times. In an attempt to locate

the vehicle Brown had been driving, a dark blue Cadillac, an early 90's model, Seger learned that a vehicle matching that description had fled from officers approximately one week earlier. Seger also was told that officers have received complaints regarding excessive traffic coming and going from the area of Clifton Brown's apartment at 646 South Spring, Apartment H, in Cape Girardeau, Missouri.

Seger contacted the Cape Girardeau Police Department canine officers. Two officers with their dogs certified for narcotics detection responded. The latest certification for both dogs occurred in February of 2006 and is good for a period of one year. The affidavit continues that Officer Jeff Bourbon walked canine Tobin around numerous storage units. The dog did not indicate the presence of a narcotic odor on any other storage unit, except Unit #349. As canine Tobin walked past Storage Unit #349, the canine indicated the presence of a narcotic odor. Officer Roy Rahn then walked canine Bolo around numerous storage units. Bolo also indicated the presence of a narcotic odor at the door of Storage Unit #349. Bolo did not indicate the presence of a narcotic odor on any other storage unit.

The alerting of a drug dog to the presence of narcotics, in itself, has been held to provide probable cause to search. Chambers v. Maroney, 390 U.S. 42, 90 S.Ct. 1975, 1981-82 (1969); United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994); United States v. Linkous, 285 F.3d 716, 721 (8th Cir. 2002). When two drug dogs separately alert, the probable cause become stronger.

The court finds that when the search warrant for Storage Unit #349 at U Store and Lock It was issued, the judge "had a 'substantial basis for ... conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. at 238, 103 S.Ct. at 2332.

**Request for Drug-Sniffing Dogs Was Unwarranted and Unconstitutional**

Next, the defendant claims that the request of the officers for drug-sniffing dogs was unwarranted, unconstitutional and resulted from a prior altercation between Mr. Brown and Agent Bernie Gard. There is absolutely no evidence to support defendant's claim that the request to bring the dogs was the result of a prior confrontation between Brown and Gard. The exterior sniff by a drug dog of a vehicle, a container or a storage unit does not infringe upon any Fourth Amendment rights. United States v. Williams, 429 F.3d 767, 772 (8th Cir. 2005), citing Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 837-838 (2005). No one's constitutional rights were violated by the officers calling for the drug dogs. Reasonable suspicion was not even required. Williams, 429 F.3d at 772.

Defendant's claim in this regard is without merit.

**Search of 639 South Spring, Apt. E**

The defendant claims the search of Apartment E located at 639 South Spring in Cape Girardeau was made without valid consent and without a valid search warrant. The evidence is to the contrary.

At first, Natasha Mayberry denied permission for the officers to go into her apartment. She explained later that she was afraid that Clifton Brown would get into a fight with the officers or possibly shoot at them and destroy property in her apartment and that's why she initially refused. (Tr. 114). Mayberry changed her mind after her mother and her aunt arrived and they and Officer William Bohnert, who had requested permission to enter Mayberry's apartment, sat down and talked. After that, Mayberry told Bohnert that "You can go in and search." (Tr. 115). A statement by Mayberry was introduced in which she says, "I gave the police consent to search my apartment. They found marijuana and two handguns in my apartment. These do not belong to me." (Tr. 116). Obviously, the search of Mayberry's apartment, Apartment E, was with consent.

## The Search of a Maroon Vehicle

The defendant, Clifton Brown, is objecting to the search of the maroon Buick driven by Co-defendant Crystal Warren. The government objects that the defendant has no standing to complain about any search of the Buick. He was not driving the Buick, Crystal Warren was. He did not own the Buick. The only way Brown could claim standing to object to the search of the Buick is if he claims the drugs seized were his drugs. He has not done so. The court finds that Defendant Clifton Brown has no standing to object to the search of the Buick driven by Crystal Warren.

Even if Brown had standing to object to the search of the Buick, his objection would be denied. He was not even present when the Buick was searched. He had run off and abandoned his own vehicle, which was stopped at the gate because an employee of U Store and Lock It had cancelled Brown's code to open the gate. Additionally, there was probable cause to believe that controlled substances were in the Buick since Officer Bourbon's drug dog alerted on the engine compartment.

Again, Defendant Brown does not have standing to object to the search of the Buick and even if he had standing, probable cause existed for the search of the Buick. In connection with Crystal Warren's motion to suppress, the court will consider the question of the time element involved in summoning the drug dogs to evaluate the Buick in the report and recommendation concerning Warren's case. The court finds the search of the Buick was not improper.

## Statements Involuntary?

Defendant's motion to suppress continues urging that any oral or written statements made by Defendant Brown were involuntary, were elicited by coercion and/or were elicited without the defendant being fully advised of his rights under the Fifth Amendment. Again, the evidence is against the defendant.

Officer Dan Seger advised Mr. Brown of his <u>Miranda</u> rights. (Tr. 67). Seger testified that he read the rights from a card. <u>Id</u>. Brown stated he understood his rights and agreed to speak with Seger. <u>Id</u>.

No evidence was adduced to indicate that any type of coercion was employed by Officer Seger or that Brown's statements were involuntary.

Mr. Brown had the presence of mind to leave the enclosure surrounding the storage units when he saw officers approaching. He went into the office to complain about his inability to leave the facility and upon seeing the officers approaching, he left by an outside door from the office. Further he had the presence of mind to go to a place he was familiar with, his apartment house, but not to go to his apartment. He went to a neighbor's apartment, who told officers that he was not there. (Later, when she admitted that Brown was in her apartment, she said she had lied because she was afraid shooting would take place which would tear up her furniture.) Later, when the officers were going to search for him in the apartment complex, Brown appeared on a balcony, asked the officers to put their guns away and said he would surrender. He was given instructions on how to surrender and he followed them. Brown had the presence of mind before that to hide weapons and drugs under a mattress in Mrs. Mayberry's apartment. When Brown came to the police station, he was cooperative and, following the administering of the <u>Miranda</u> warnings, answered questions.

Although Brown admitted that he put the cocaine base and the cocaine powder in the engine compartment of the Buick, he claimed he had found the drugs in a backpack along the road and was going to give them to his friends. Whether the backpack story was wise or believable is a question for the jury, but the quickness and agility of mind to come up with such a story is further evidence of the defendant's ability to meet the needs of the moment and is not the mark of a person who did not know what he was doing.

The court finds no evidence of any condition or circumstances indicating the defendant's waiver of his Miranda rights was involuntary.

The defendant argues further that he was not fully advised of and afforded his rights under the Fifth Amendment. The court interprets this as the defendant's claiming that he was not fully given his rights. In defendant's memorandum filed after the evidentiary hearing, he complained that when Detective Seger recited on the witness stand the Miranda warnings, he left out the phrase "used against you" following "anything you say can and will be used in a court of law."

Of course, if there were a trial in a court of law, it seems clear that anything used by the prosecution would be "used against" the defendant. Further, what Seger stated on the stand was a recitation from memory of the Miranda warnings. In point of fact, when the warnings were administered before the defendant gave his statement to Seger, the rights were read from a card. Finally, on this point, the Miranda opinion itself states that warnings do not have to be given exactly as written in the Miranda opinion, but law enforcement officials must convey Miranda's essential message to the suspects and procedures must be "at least as effective [as Miranda warnings] in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." Miranda, 384 U.S. at 467.

Defendant's waiver of his Miranda warnings was knowing and was made with an understanding of what those rights were.

The court finds the statements of Clifton Brown to Detective Seger at the police station were voluntary and are admissible at trial.

Finally, the defendant claims that his statements should be suppressed because they were the result of an unlawful arrest. Before the defendant was arrested, the officers had found in Unit #349 various weapons and rounds of ammunition and shells, "a red backpack containing: four packages

of marijuana weighing 2313 grams (approximately 5 pounds); and 2 empty vacuum type bags," as well as "a blue tote box containing: a digital scale with cocaine residue; and an empty box for a Triton T-2 digital scale; and a box containing .38 Special ammunition; a small quantity of marijuana; and numerous sandwich baggies," all pointing toward drug trafficking by Brown. Crystal Warren had told Special Agent Bernie Gard that she saw Brown put the packages under the hood of the Buick and that she knew the materials were cocaine.

The court finds that law enforcement officers had probable cause to arrest Clifton Brown and that his statements to Officer Seger were not obtained as the result of an unlawful arrest. The court further finds that the statements the defendant made on April 18, 2006, are admissible at trial.

It is not clear if the defendant is trying to claim that his statements to Agent Gard on April 17, 2006, somehow required Miranda warnings. The confrontation was initiated by Brown. He was not in custody. There was no interrogation on Gard's part and Miranda warnings were not necessary. Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397 (1990) (holding that Miranda warnings are only required when a suspect is in custody and is subjected to state interrogation); United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995).

### Defendant's Post-Hearing Memorandum

In his memorandum filed after the evidentiary hearing on his motion to suppress, the defendant raised other points. He claims first that Agent Bernie Gard was "merely incorrect in assessing a probable cause fact scenario" when he thought driving 15 to 20 miles an hour in a posted 35-mile-per-hour zone was suspicious. The court cannot fault Agent Gard for feeling that that automobile going 15 to 20 miles below the speed limit for the length of a football field was unusual or suspicious. What may not appear suspicious to untrained laymen may well be seen as suspicious by an experienced law enforcement officer, especially a drug investigator. United States v. Sokolow,

490 U.S. 1, 9 (1989); United States v. Arvizu, 534 U.S. 266, 277 (2002); Ornelas v. United States, 517 U.S. 690, 700 (1996).

The defendant claims that the actions of Agent Gard consisting of going into the enclosed facility on April 17, 2006, without permission was "unlawful and infringed upon Mr. Brown's reasonable expectation of privacy in his storage unit."

Agent Gard did not infringe upon any of the defendant's legitimate rights of privacy when he went into the storage facility. The owner of the facility might have been able to complain that Gard was trespassing, but Gard was not trespassing on any property owned by the defendant. If Gard had entered Unit #349 without a search warrant on April 17, 2006, the defendant would have a right to complain. He has no right to complain about Agent Gard's entering upon the facility. When Gard drove by Unit #349, the door was open and whatever was inside was in full view of anyone who went by. The aisle on which Gard drove as he went past #349 was not subject to rental rights or exclusive possession by the defendant. Brown had no right of privacy preventing another from looking in his open unit from an aisle designed for the use by anyone who was in the unit. Defendant's argument is a "stretch" and is not valid.

### RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that the Defendant's Motion to Suppress Evidence and Statements (Document #41) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for

good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of November, 2006.